**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

WENDY FLETCHER and JAMES HUGHES,

                             Plaintiffs,

        - v -                                8:22-CV-314
                                             (DJS)

VILLAGE OF LAKE PLACID,

                             Defendant.

| APPEARANCES: | OF COUNSEL: |
|---|---|
| WOJDAN-PRICE LAW | JENNA M. WOJDAN-PRICE, ESQ. |
| Attorney for Plaintiffs | |
| 135 Delaware Avenue, Suite 406 | |
| Buffalo, New York 14202 | |
| | |
| RUPP PFALZGRAF LLC | R. ANTHONY RUPP, III, ESQ. |
| Attorney for Plaintiffs | JONATHAN P. CANTIL, ESQ. |
| 1600 Liberty Building | MATTHEW E. GABALSKI, ESQ. |
| 424 Main Street | YOUNG WOO KIM, ESQ. |
| Buffalo, New York 14202 | PHILLIP A. OSWALD, ESQ. |
| | |
| THE LAWS GROUP PLLC | APRIL J. LAWS, ESQ. |
| Attorney for Defendant | DEANNA R. GIROUX, ESQ. |
| 646 Plank Road, Suite 205 | |
| Clifton Park, New York 12065 | |

**DANIEL J. STEWART**
**United States Magistrate Judge**

<u>**MEMORANDUM-DECISION AND ORDER**</u>[1]

**I. BACKGROUND**

Wendy Fletcher and James Hughes commenced this action against the Village of Lake Placid as well as numerous individual and corporate Defendants in a Complaint originally filed in April 2022. Dkt. No. 1. An Amended Complaint was filed in March 2023, Dkt. No. 60, Am. Compl., and is the operative pleading. Motions to dismiss resulted in the dismissal of the vast majority of claims and parties from this litigation. *Fletcher v. Vill. of Lake Placid*, 2023 WL 8573860, at *1 (N.D.N.Y. Dec. 11, 2023) ("*Fletcher I*"); Dkt. No. 129. Only two claims remain. *Fletcher I*, 2023 WL 8573860, at *25. Both Plaintiffs assert a federal constitutional claim against the Village. Am. Compl. at ¶¶ 255-66. Plaintiff Fletcher also asserts a claim pursuant to Title II of the Americans with Disabilities Act ("ADA"). *Id.* at ¶¶ 240-54.[2]

The parties have each now filed Motions for Summary Judgment. Dkt. Nos. 160 & 162. The Village's Motion seeks dismissal of both remaining claims and identifies the following grounds for summary judgment: the failure to join a necessary party, failure to plead an unconstitutional policy or practice, the merits of the ADA claim, as well as assertions that Plaintiff Fletcher's ADA claim is moot and she lacks standing. Dkt. No. 160-23, Def.'s Mem. of Law at pp. 11-24. Plaintiffs oppose the Motion. Dkt. No. 174, Pls.' Opp. Defendant filed a reply. Dkt. No. 175, Def.'s Reply.

---

[1] The parties have consented to have the undersigned address this matter. Dkt. No. 147.

[2] The Amended Complaint purports to identify Hughes as a plaintiff with respect to the ADA claim as well. Am. Compl. at ¶ 240. Any such claim has been dismissed. *Fletcher I*, 2023 WL 8573860, at *4 n.3.

Plaintiffs have also filed a Motion for Summary Judgment seeking judgment in their favor as to both claims. Dkt. Nos. 162 & 163. Plaintiffs seek judgment on the merits of each claim. Dkt. No. 162-18, Pls.' Mem. of Law. Defendant opposes the Motion, Dkt. No. 173, Def.'s Opp., and Plaintiffs replied. Dkt. No. 176, Pls.' Reply. Upon being notified by the Court that their original submissions omitted some documents, Plaintiffs made an additional submission. Dkt. No. 179.

For the reasons that follow, Defendant's Motion is granted in part and denied in part. Plaintiffs' Motion is denied.

## II. FACTUAL SUMMARY RELEVANT TO DISPOSITION OF THE MOTIONS

Plaintiff Wendy Fletcher is the owner of property at 18 Grace Way (the "Grace Way Property") in the Village. Dkt. No. 174-1 at ¶ 56.[3] Fletcher has been diagnosed with multiple sclerosis. *Id.* at ¶ 133. She and Plaintiff James Hughes moved into the Grace Way Property in 2015. Dkt. No. 160-2, Pl.'s Dep. Vol. 1 at p. 29. That property includes a home, which is located between Main Street in the Village and Mirror Lake. *See* Dkt. No. 174-1 at ¶¶ 59, 63-64, & 99. It also includes a foundation from a business construction project started by Plaintiffs but not completed. *Id.* at ¶¶ 63 & 65-67. The foundation is directly next to Main Street. *Id.* at ¶ 64. There are three permanent points of ingress and egress from the Grace Way Property: a driveway on Grace Way, a private road; a staircase going up from the property to Main Street next to the Shea building; and a similar staircase next to the Northwood School building. *See id.* at ¶¶ 71-72, 79, 89, 91,

---

[3] Insofar as the parties have admitted statements made in their respective Statements of Material Fact, those documents may be cited herein in lieu of citation to the underlying record.

& 96.[4]  In June 2019, Hughes built stairs ("Hughes stairs") through the foundation located on the Grace Way Property as a fourth access point.  *Id.* at ¶¶ 113-16.  Plaintiff testified that those steps were temporary.  *Id.* at ¶¶ 110 & 113; Dkt. No. 160-5, Pl.'s Dep. Vol. 2 at p. 38.

In 2019, Craig Randall was the Mayor of the Village.  Dkt. No. 160-21, Randall Decl., ¶ 3.  In that capacity, he was also a member of the Village Board.  *Id.* at ¶ 9.  At the time, Art Devlin was the Village's Deputy Mayor and also a member of the Village Board.  Dkt. No. 160-19, Devlin Dec., ¶¶ 3 & 10.  Anita Estling is the Village Clerk and held that position in the spring of 2019.  Dkt. No. 160-20, Estling Decl., ¶ 3.

The Northwood School is a private school in Lake Placid.  Am. Compl. at ¶ 26.  It purchased property on Main Street, next to the Grace Way Property, and in 2019 sought to begin renovation work at the site.  Dkt. No. 174-1 at ¶¶ 69 & 98; Am. Compl. at ¶ 81.  Previous discussions of proposed work at that location had occurred between Northwood and Hughes.  *Id.* at ¶¶ 119-21.  On Friday, March 29, 2019, an official from Northwood School hand delivered a letter to Estling regarding the School's intention to begin work on that property and asking for Village approval of certain aspects of the plan that required using Main Street to facilitate the project.  Dkt. No. 174-1 at ¶ 151; Randall Decl. at ¶ 6; Dkt. No. 160-1, Laws Decl., Ex. I.  In response, Randall directed that a meeting of the Village Board be scheduled.  Dkt. No. 174-1 at ¶ 152; Randall Decl. at ¶ 6; Estling Decl. at ¶ 5.  On Tuesday, April 2, 2019, Estling provided notice that a meeting would be held

---

[4] In this opinion these routes are sometimes referred to as rights of way ("ROW") and identified as the Shea ROW or Northwood ROW.

on Wednesday, April 3, 2019, by posting on the Village's Facebook page. Dkt. No. 174-1 at ¶ 153; Estling Decl. at ¶ 5; Laws Decl. at Ex. J. Plaintiffs claim they did not receive notice of the meeting. Am. Compl. at ¶ 116. The meeting was held and the Village Board voted to approve the plan set forth by the School. Laws Decl. at Ex. K.

During the course of the construction that followed, construction crews walled off the Northwood ROW, making it inaccessible to Plaintiffs. Dkt. No. 162-1, Wojdan-Price Decl., Ex. E1. Construction barriers were then placed on the sidewalk directly in front of the Grace Way Property blocking access to the sidewalk. *See*, *e.g.*, *id.* at Ex. E4. The Hughes stairs were built after construction work had begun. Dkt. No. 174-1 at ¶ 114. During this time construction equipment was often parked in that location and blocked the Hughes stairs and the Northwood ROW. *See*, *e.g.*, Wojdan-Price Decl. at Ex. E4. It does not appear that the Shea ROW was ever blocked off by construction work. *Id.*; Laws Decl. at Ex. N. A temporary pedestrian walkway was established to divert traffic around the Northwood construction site. *See*, *e.g.*, Wojdan-Price Decl. at Ex. E2. For a period of several months, Fletcher alleges that she was unable to access the sidewalk adjacent to her property. Dkt. No. 174-1 at ¶ 201.

In 2021 and 2022, the Village undertook a separate infrastructure project that involved work on Main Street and its adjacent sidewalks. Am. Compl. at ¶¶ 88-90. Fletcher was not present in the Village during much of the time in which work was being conducted on this project and actually rented the Grace Way Property during this time. *Id.* at ¶¶ 90-91; Pl.'s Dep. Vol. 2 at pp. 15-17; Dkt. No. 174-1 at ¶¶ 73-76. At the

completion of the project, the sidewalk reconstruction created a height differential between the sidewalk and the Hughes stairs which Plaintiff alleges hinders her ability to use those stairs.  Dkt. No. 174-1 at ¶ 218.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. at 323.  To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant.  FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc*., 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Failure to Join Necessary Parties

Defendant argues first that summary judgment should be granted because of "Plaintiffs' failure to join an indispensable party, *New York State*." Def.'s Mem. of Law at p. 12 (emphasis added). Summary judgment is not appropriate on this ground.

As to the claim under section 1983, this argument fails for several reasons. New York State would not be a proper party for a claim under section 1983. *Restivo v. Hessemann*, 846 F.3d 547, 583 (2d Cir. 2017) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("a state is not a proper defendant in an action brought pursuant to Section 1983.")). Joining the State, therefore, would have been futile. Nor is any state official implicated with respect to the facts of that claim. It involves solely a question of whether Village officials provided appropriate notice of a Village Board meeting. *See Fletcher I*, 2023 WL 8573860, at *5 (discussing nature of Plaintiffs' due process claim);

7

Am. Compl at ¶¶ 171-75.   The suggestion in reply that individual Department of Transportation officials should have been named, Def.'s Reply at p. 2, does nothing to address that argument.   Defendant has simply made no argument to demonstrate a basis for or necessity of adding any New York State employee as a party to a claim about the notice of a Village meeting.

With regard to the ADA claim, the Court is also not persuaded that summary judgment is warranted.   Contrary to Plaintiff's suggestion, Pls.' Opp. at p. 8, Title II of the ADA did serve as a waiver of the State's sovereign immunity.   *United States v. Georgia*, 546 U.S. 151, 157-59 (2006).   Defendant, however, has made no showing that the State is a necessary party here.   Under the Federal Rules of Civil Procedure, a party is necessary to adjudication of the case if "the court cannot accord complete relief among existing parties" or providing relief would necessarily seriously impair the rights of the person or entity not joined.   FED. R. CIV. P. 19(a)(1).   Defendant places significant emphasis on the fact that New York's Department of Transportation "exercised oversight" over both infrastructure projects at issue here.   Def.'s Reply at p. 2.   Even assuming that to be true, however, does not make the State a necessary party.   *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 315 (W.D.N.Y. 2007).   The Village offers no argument or factual evidence to suggest that full relief cannot be provided here or that the State's interests would be impaired by any judgment rendered here.   This matter has been litigated for four years without the suggestion, to the best of the Court's knowledge, that a necessary party was missing.   The

Village's current conclusory assertion that necessary parties have not been joined is insufficient to justify dismissal. *Carson v. Kentucky Fried Chicken of Cal.*, 1997 WL 615240, at *3 (S.D.N.Y. Oct. 3, 1997).

**B. Section 1983 Due Process Claim**

Plaintiffs allege that their due process rights were violated when the Village failed to provide the notice required under state law before the April 3 meeting. Am. Compl. at ¶ 117. This claim is brought solely against the Village on a theory of municipal liability. *See generally Fletcher I*, 2023 WL 8573860, at *25. Defendant is entitled to summary judgment as to this claim.

In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court recognized that a local municipality, like the Village, can be held liable for violations of constitutional rights under certain circumstances. 436 U.S. 658, 690-91 (1978). "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

Consistent with this rule, a prerequisite to municipal liability is the existence of an "underlying constitutional violation." *De Asis v. New York City Police Dep't*, 352 F. App'x 517, 518 (2d Cir. 2009); *see also Ameduri v. Vill. of Frankfort*, 2014 WL 12894099, at *2 (N.D.N.Y. Nov. 4, 2014) ("There can be no municipal liability under *Monell* in the absence of an underlying constitutional violation."). Neither party raised

the question of whether Plaintiffs had any due process right to notice in advance of the meeting in their summary judgment papers. Pursuant to FED. R. CIV. P. 56(f), the Court advised the parties that it was considering granting summary judgment on this ground and afforded them the opportunity to address the matter. Dkt. No. 184. Plaintiffs and Defendant have filed supplemental memoranda of law on the issue. Dkt. Nos. 195, Pls.' Supp. Mem. of Law, & 196. For several reasons, Plaintiffs have no section 1983 claim.

*1. Underlying Constitutional Violation*

First, Plaintiffs misapply state law and its relevance to their claim. Plaintiffs claim they were entitled to 72 hours' notice of the Village Board meeting under New York Public Officers Law. Am. Compl. at ¶ 117; Pl.'s Mem. of Law at pp. 14-15. The provision on which they rely provides that "[p]ublic notice of the time and place of a meeting scheduled at least one week prior thereto shall be given or electronically transmitted to the news media and shall be conspicuously posted in one or more designated public locations at least seventy-two hours before such meeting." N.Y. Pub. Off. Law § 104(1). The record in this case demonstrates that the meeting was not "scheduled at least one week prior." Instead, it was scheduled for Wednesday, April 3, just five days after Randall received a letter from Northwood School on Friday, March 29. Dkt. No. 174-1 at ¶¶ 151-53; Randall Decl. at ¶ 6; Estling Decl. at ¶ 5. As a result, subdivision two, not one, of section 104 would be the operative provision as a matter of state law. That provision, applicable to meetings scheduled on shorter notice, does not require 72 hours' notice. Instead, it requires notice to be provided "to the extent

practicable . . . at a reasonable time prior" to the hearing.  N.Y. Pub. Off. Law § 104(2).  Plaintiffs have not shown that inadequate notice was provided under that provision.

In any event, state law does not dictate the scope of federal due process protections because "a violation of state procedural law does not necessarily mean that the federal due process clause has been violated."  *Shabazz v. Bezio*, 669 F. App'x 592, 593 (2d Cir. 2026) (citing *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d. Cir. 2003)).  State law, therefore, does not provide a basis for finding the Village denied Plaintiffs due process.  Instead, "we look to 'federal constitutional standards rather than state statutes to define the requirements of procedural due process.'"  *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019) (quoting *Robison v. Via*, 821 F.2d 913, 923 (2d Cir. 1987)) (internal alterations omitted).

Generally, as a matter of federal law, due process involves "the right to notice and a meaningful opportunity to be heard."  *LaChance v. Erickson*, 522 U.S. 262, 266 (1998) (citing *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)).  "These constitutional requirements apply only where the official action is 'designed to adjudicate disputed facts in particular cases.'"  *Baines v. Masiello*, 288 F. Supp. 2d 376, 388 (W.D.N.Y. 2003) (quoting *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245 (1973)).  However, "it is black letter law that a person is not entitled to procedural due process protections against government action that is legislative in nature."  *Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705, 714 (S.D.N.Y. 2021) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)).  "A government action

11

is legislative in nature if it has 'general application' and 'applies prospectively.'" *Roberts v. Fleury*, 2024 WL 1242231, at *8 (N.D.N.Y. Mar. 22, 2024) (quoting *Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d at 714).

It seems quite clear that the actions taken by the Village Board at the challenged meeting were legislative in nature and, as such, Plaintiffs were not entitled to the notice they allege.   The plan considered and adopted by the Board concerned a public thoroughfare and all who would use it.  It was clearly a matter of general applicability and, since it involved future access, it was clearly prospective.  Plaintiffs' arguments to the contrary are without merit.

Plaintiffs suggest that the "special meeting did not involve a generally applicable policy choice" because it "concerned one project, one applicant, one site, and one set of immediately affected neighboring owners." Pls.' Supp. Mem. at p. 2.  That the resolution originated because of a particular project does not itself make it non-legislative.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).  More importantly, Judge Sannes has already concluded to the contrary.  In dismissing individual section 1983 claims against the Village board members, she concluded that acting on the Northwood School's proposal was "within the sphere of legislative activity" and thus the Board members were immune from suit. *Fletcher I*, 2023 WL 8573860, at *15.  Judge Sannes noted that "the vote is not alleged to have only affected Plaintiffs" and "this sort of policymaking clearly flows from the legislative function." *Id.*; *see also Livant v. Clifton*, 334 F. Supp. 2d 321,

12

326 (E.D.N.Y. 2004), *aff'd*, 272 F. App'x 113 (2d Cir. 2008).  That conclusion is law of the case.

This finding is amplified by the summary judgment record.  First, Plaintiffs' current argument is inconsistent with what the record shows about how the Northwood project affected pedestrian traffic in the Village generally beyond just Plaintiffs.  As Judge Sannes recognized, "the vote is not alleged to have only affected Plaintiffs - it involved approving a construction plan for a private school building."  *Fletcher I*, 2023 WL 8573860, at *15.  The meeting was held to consider a "plan for use of Main Street."  Laws Decl., Ex. K at p. 4; *see also* Laws Decl. at Ex. J (comments from Randall noting that the Board meeting was "about a plan to accommodate parking, pedestrian access to the sidewalk and traffic flows during actual construction").  The proposed plan that was considered at the meeting included temporary closures of walkways, the addition of a temporary crosswalk, and the closure of a public loading zone.  Laws Decl., Ex. K at p. 4 The plan also included the installation of temporary protective measures, discussed the use of cranes on Main Street, set forth parameters for the placement and removal of dumpsters, and addressed parking concerns in and around the Village related to the project.  *Id.* at Ex. K pp. 4-5.  The proposal specifically recognized the "disruption to Main Street" that the project would involve.  *Id.* at Ex. I.  Evidence provided by Plaintiffs shows the impact this project had on pedestrians generally traversing this part of the Village.  Wojdan-Price Decl. at Exs. E2, E4, & E7.  That Plaintiffs may have felt the impact more frequently given their proximity to the work zone does not make the project

any less generally applicable.   The effects of the resolution's passage affected anyone travelling in this area of the Village during the project and so was a matter of "general application" for the Village.  This was clearly "a legislative act . . . in that it . . . involved the making of policy regarding building and construction in the Village." *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, 111 F. Supp. 3d 459, 492 (S.D.N.Y. 2015).

Plaintiffs, therefore, have failed to show any underlying constitutional violation.

### *2. Monell*

Even were due process implicated on these facts, the Village would be entitled to summary judgment because Plaintiffs have not established a basis for municipal liability.

> The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and alterations omitted).   Plaintiffs' claim hinges on the second of these possibilities: the actions of final governmental policy makers.  *See* Am. Compl. at ¶¶ 17 & 20; Pls.' Mem. of Law at pp. 14-15; *see also Fletcher I*, 2023 WL 8573860, at *14.[5]

The gravamen of Plaintiffs' claim is that the Village is liable, through the acts of a final policymaker, for failing to comply with New York law to ensure that proper notice

---

[5] The Amended Complaint also refers to a failure to train employees regarding provision of proper notice, Am. Compl. at ¶ 258, but that claim was previously dismissed. *Fletcher I*, 2023 WL 8573860, at *13.

14

of the Special Meeting was provided.  Plaintiffs specifically contend that Randall and Devlin were the Village officials with final policymaking authority as to this matter.  Pls.' Mem. of Law at pp. 14-15.  The question then focuses on the notice provided and by whom.  The undisputed facts establish that the April 3 meeting was scheduled because of a letter received by Randall on March 29, and that some notice of the meeting was provided.  Dkt. No. 174-1 at ¶¶ 151-53; Randall Decl. at ¶ 6; Estling Decl. at ¶ 5.

At his deposition, Devlin testified that he did not know specifics about how notice was provided to the public regarding the meeting.  Dkt. No. 162-11 at pp. 35-36.  He did testify that he "would assume" that this was done by the Village Clerk.  *Id.* at p. 36.  He also submitted a sworn declaration affirming that he had "no role in organizing or calling the meeting."  Devlin Decl. at ¶ 5.  Randall concedes that he directed that the meeting be scheduled, Randall Decl. at ¶ 6, but according to him, the Village Clerk was responsible for providing notice.  *Id.* at ¶ 7.  The Village Clerk confirms that she provided notice via a Facebook post on April 2.  Estling Decl. at ¶ 5.

"Under *Monell*, state law determines whether the municipal entity or official possessed final policymaking authority with regard to the actions in question and is therefore subject to § 1983 liability."  *Chislett v. New York City Dep't of Educ.*, 157 F.4th 172, 184 n.3 (2d Cir. 2025).  Plaintiffs bear the burden of establishing that an official had final policymaking authority.  *Edrei v. City of New York*, 254 F. Supp. 3d 565, 580 (S.D.N.Y. 2017), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018); *Delrosario v. City of New York*, 2010 WL 882990, at *6 (S.D.N.Y. Mar. 4, 2010).

15

The Court has little trouble imagining situations in which the Mayor of the Village has policymaking authority.  It may also be true that an individual board member could have certain policymaking authority.  But policymaking authority under *Monell* is tied to specific functions rather than broad authority generally.  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered*."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (emphasis added).  In *Roe v. City of Waterbury*, the Second Circuit made this clear by highlighting that "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."  542 F.3d 31, 37 (2d Cir. 2008).  To avoid dismissal, therefore, Plaintiffs must show that either Devlin or Randall had final policymaking authority for provision of notice regarding public meetings.  As such "an allegation of policy-making authority . . . requires proof of the official's scope of employment and his role within the municipal or corporate organization."  *Levin v. City of Buffalo*, 179 F.4th 132, 141 (2d Cir. 2026).

Plaintiffs have not carried that burden here.  They cite no authority – statutory, regulatory, or from caselaw – suggesting who bore the final authority for providing notice of such meetings under New York law.  Indeed, no authority is cited by any party demonstrating if any one individual has that specific function.  New York's Village Law does not specifically designate to the Mayor such authority.  *See* N.Y. Village Law § 4-

16

400.  Nor is that task assigned to a village clerk or board of trustees.  *See* N.Y. Village Law §§ 4-402 & 4-412.  Plaintiffs, therefore, have not established that either Randall or Devlin were policymakers for the purpose of providing notice.

In their papers relating to these Motions, Plaintiffs appear to place significant emphasis on the votes Devlin and Randall cast regarding the resolution, *see*, *e.g.*, Pls.' Opp. at p. 13 ("Mayor Randall and Deputy Mayor Devlin were acting in their official capacities, following established procedures for approving construction plans."), but what happened at the meeting is irrelevant to the notice issue on which Plaintiffs' due process claim is based.  The harm alleged by Plaintiffs is that the lack of notice "prevented Plaintiffs from attending [the meeting] to challenge" the Northwood proposal, Am. Compl. at ¶ 119, *before* the Village acted on matters related to Northwood's construction project.  How members of the Board voted at the meeting does not implicate whether proper notice was provided.  The action challenged by Plaintiffs is not the Board's passage of a resolution, but the lack of notice beforehand.

While *Monell* also permits a finding of liability when actions are taken pursuant to a municipal policy or custom, *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 355 (2d Cir. 2021), none has been shown here.  Liability may exist under this standard when the "practices were persistent and widespread so as to constitute a custom or usage with the force of law." *Chislett v. New York City Dep't of Educ.*, 157 F.4th 172, 184 (2d Cir. 2025) (internal quotation and citation omitted).  Clearly there is no evidence of a custom of failing to provide notice of Village Board meetings.  Plaintiff Hughes, for example, was

a regular attendee at Village meetings and notes in support of his Motion that he typically received notice from a Village mailing list.  Dkt. No. 160-16, Bliss Decl., Ex. A at pp. 24-25; *see also* Wojdan-Price Decl. at Ex. I.  Plaintiff Hughes concedes that the Village had a process in place, namely using an email list, that generally provided him notice of the Village's meetings.  The Amended Complaint alleges that Hughes received "notice of each and every Open Public Meetings prior via said email list."  Am. Compl. at ¶ 116.  Given that record, there is zero evidence of any policy or custom to deny notice of meetings to residents.

Accordingly, Plaintiffs' Motion for Summary Judgment as to the due process claim is denied, while Defendant's is granted.  Plaintiffs' due process claim is dismissed.  Plaintiff Hughes was only a party as to this claim and, as a result, all claims brought by him are now dismissed.

### C. Americans with Disabilities Act Claim

Plaintiff Fletcher also asserts a claim for discrimination under Title II of the Americans with Disabilities Act.  Am. Compl. at ¶¶ 240-54.  She alleges generally that during the course of the two construction projects she was denied meaningful access, either entirely or in part, to Main Street and its adjacent sidewalk.  *Id.*; *see also* Pls.' Mem. of Law at pp. 5 & 7-12.

### *1. Admissibility of Evidence*

At the outset, the Court must address what evidence is properly before the Court on these Motions.  Plaintiff has offered expert opinions from Sharon Lobo and Dr. Fred

Lubin as evidence in support of her Motion. Defendant objects that these reports are inadmissible for purposes of the Motion because they are not sworn. Def.'s Opp. at pp. 3-6.[6]

Defendant correctly notes that courts not infrequently deem unsworn reports, such as that from Ms. Lobo, inadmissible at the summary judgment stage. *See*, *e.g.*, *Marcano v. Schindler Elevator Corp.*, 2024 WL 4827405, at *2 (S.D.N.Y. Nov. 19, 2024) (citing cases). However, "[t]he form of evidence supporting a motion for summary judgment need not itself be admissible at trial." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 231 (S.D.N.Y. 2021), *aff'd sub nom. Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170 (2d Cir. 2022). "While expert reports would be inadmissible hearsay at trial, if the opinions of the experts would be admissible at trial, expert reports can show that there is admissible evidence for trial." *Id.* (citing cases). Accordingly, "[m]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question will be presented in admissible form at trial, it may be considered at summary judgment." *Bunnenberg v. Liberty Mut. Fire Ins. Co.*, 2024 WL 4278644, at *8 (N.D.N.Y. Sept. 24, 2024) (internal quotation and citation omitted).

The Court, therefore, will consider the challenged evidence in deciding this Motion.

---

[6] Other evidence has been presented by way of an attorney declaration, from both counsel, which also fails to present the material in admissible form. The same logic set forth below applies equally to those exhibits.

19

*2. Merits*

"Title II of the ADA proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

> To assert a claim under Title II of the ADA . . . , a plaintiff must demonstrate that (1) [s]he is a qualified individual with a disability; (2) the defendant is subject to . . . the Act[]; and (3) [s]he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of h[er] disability.

*McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

"A qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 84-85 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (citing 42 U.S.C. § 12131(2)). Plaintiff Fletcher has been diagnosed with multiple sclerosis. Dkt. No. 173-4 at ¶ 10. While Defendant denies that Plaintiff's condition causes her some of the purported limiting effects, *id.* at ¶¶ 10-11, the Court does not understand the Village to dispute, at least for purposes of this Motion, that Plaintiff is a qualified individual under the ADA. *See generally* Def.'s Opp. at pp. 6-14 (discussing grounds for rejecting Plaintiff's ADA claim). And clearly the Village is subject to the provisions of Title II. *See* 42 U.S.C. § 12131(1)(A).

The question on the present Motions, therefore, is whether either party has established their entitlement to judgment on the question of whether Plaintiff has been "denied the opportunity to participate in or benefit from the [D]efendant's services, programs, or activities, or was otherwise discriminated against by the [D]efendant because of h[er] disability." *McElwee v. Cnty. of Orange*, 700 F.3d at 640 (citing *Henrietta D. v. Bloomberg*, 331 F.3d at 272). "Title II . . . require[s] only that entities make 'reasonable accommodations' to enable meaningful access to services, programs, and activities." *Bernstein v. City of New York*, 621 F. App'x 56, 59 (2d Cir. 2015) (quoting *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam)); *see also Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004) ("Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities. And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service."). "In examining this claim, we ask whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d at 273).

This Court recognizes, as did Judge Sannes' prior Decision, that "Plaintiff Fletcher's claim focuses on the public sidewalks owned and operated by the Village of Lake Placid." *Fletcher I*, 2023 WL 8573860, at *18. The Amended Complaint alleges

21

several times that Ms. Fletcher was denied reasonable access to Lake Placid's public sidewalks.  Am. Compl. at ¶¶ 91, 141, & 248.  Courts have recognized that "maintaining the accessibility of pedestrian pathways, such as sidewalks . . . has been held to fall within the purview of Title II." *Lugo v. City of Troy, New York*, 2024 WL 4950105, at *5 (N.D.N.Y. Dec. 3, 2024) (citing cases); *see also Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 230 (S.D.N.Y. 2020) (courts have recognized that "the building, alteration, and maintenance of city sidewalks constitutes a service within the meaning of Title II").

### a. Northwood School Project

Plaintiff claims that the Northwood project, by closing the sidewalk next to the Northwood School building, resulted in ADA violations because it denied her access to a means of egress from her property and that the alternative pedestrian access route established was not ADA compliant.  Plaintiff's first contention is not supported by the record or caselaw applicable to Title II.  The second poses questions of fact that must be resolved at trial.

### i. Sidewalk Closure

Photographic and video evidence makes clear that the sidewalk area adjacent to Plaintiff's property was impeded or blocked at various times while the project was ongoing.  *See*, *e.g.*, Wojdan-Price Decl., Exs. E-2 at pp. 1-2, E3, E-6, E-8, & H.[7]  That

---

[7] Plaintiff offers an additional video of a purported blocked gate.  Wojdan-Price Decl. at Ex. E9.  The video reveals, however, that the only blockage was from a traffic cone that was easily moved out of the way.  *Id.*  Nothing about that incident suggests anything violative of the ADA.

alone, however, does not establish Plaintiff's claim.  Instead, to the extent Plaintiff asserts that the closure of the sidewalk itself violated the ADA, her claim cannot proceed.

The record establishes that, when the sidewalk was closed, it was closed to all pedestrians.  A claim under the ADA requires "there must be something different about the way the plaintiff is treated 'by reason of . . . disability.'"  *Henrietta D. v. Bloomberg*, 331 F.3d at 276 (quoting 42 U.S.C. § 12132).  Put another way, "[i]n order to recover compensatory damages under Title II of the ADA . . . , the plaintiff must show that the discrimination was intentional."  *Blevins v. Town of Brighton*, 2025 WL 1906756, at *6 (W.D.N.Y. July 10, 2025); *see also Galarza v. City of New York*, 2025 WL 1303866, at *14 (S.D.N.Y. Jan. 6, 2025) ("Under Title II of the ADA . . . a plaintiff can recover compensatory damages only upon a showing of intentional discrimination.").  To the extent there was a complete lack of access on the sidewalk immediately in front of the Grace Way Property, Plaintiff cannot establish that was the result of intentional discrimination by the Village based on her disability.  The impediments to access to the sidewalk during this time did not single out Plaintiff in any way.  When the sidewalk was blocked, it was blocked to all potential users, including Hughes.  "In the present case, both disabled and non-disabled persons are blocked from using the sidewalk [and] . . . [t]here is no instance of discrimination here to support Plaintiff's ADA claim. Defendant[] [is] entitled to summary judgment on this issue."  *Elguezabal v. GBG Props. Two LLC*, 2019 WL 6792815, at *3 (C.D. Cal. Oct. 2, 2019).

To the extent Plaintiff attempts to assert claims regarding denial of access by way of certain rights of way, *compare* Def.'s Mem. of Law at pp. 5-7 & 17 & Def.'s Opp. at pp. 6-12 *with* Pls.' Opp at pp. 15-16, her claim fares no better.  Like the sidewalk itself, access to the sidewalk from the Hughes stairs[8] and Northwood ROW were closed to all. Specifically, Hughes and Fletcher faced the same lack of access by their closure, and so Plaintiff cannot claim a lack of access based upon her disability.

It does not appear that the Shea ROW was closed, but rather that it could provide access to Main Street from the Grace Way Property.  *See* Wojdan-Price Decl. at Ex. E4; Bliss Decl.; Laws Decl. at Ex. N.  The record reflects that the Grace Way Property has an easement over the Shea property to Main Street.  Bliss Decl. at ¶ 10 & Ex. B.  Plaintiff, however, chose not to use that ROW and had not done so since at least January 1, 2018, because of its condition.  Bliss Decl., Ex. A at p. 5; *see also* Pl.'s Dep. Vol. 1 at p. 138. That was more than a year before the Northwood project commenced in April 2019.  Any lack of access to Main Street via that ROW, therefore, is not attributable to the project or the Village.

Finally, there is the Grace Way driveway access point.  While Plaintiff testified that she could not walk up the Grace Way driveway because of its slope, Pl.'s Dep. at p. 72, the record shows she could use the driveway as a means to access Main Street in a vehicle.  Dkt. No. 174-1 at ¶ 190.  While this was clearly not Plaintiff's preferred means

---

[8] The Hughes stairs, it must be reiterated, were not built until June 2019.  Dkt. No. 174-1 at ¶¶ 114-15.  They were temporary, *id.* at ¶ 113, and built into what was already an active construction zone.  *See id.* at ¶ 114.  The Court greatly doubts that Plaintiff could in any event claim a denial of access via the stairs under such circumstances.

of access, the ADA does not guarantee access by a preferred method. "Nowhere in the ADA guidelines is there the requirement that a plaintiff has the ability to select a specific pathway to make accessible when there is already another accessible route available." *Feltenstein v. Wykagyl Assocs. HJ, LLC*, 184 F. Supp. 3d 76, 82 (S.D.N.Y. 2016); *see also Wilson v. Pier I Imports (US), Inc.*, 439 F. Supp. 2d 1054, 1071 (E.D. Cal. 2006).

Plaintiff did testify that the Grace Way driveway was sometimes blocked by vehicles. Dkt. No. 174-1 at ¶ 192. Such blockages it appears were intermittent. Pl.'s Dep. at pp. 74-75. Despite those issues, Plaintiff could access Main Street by car using the driveway "[a] majority of the time." *Id.* at p. 74. While "complete exclusion is not the test of liability under the ADA," *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d at 235, the ADA does not apply to "non-trivial temporal delays that limit access to programs, services, and activities." *Wright v. New York State Dep't of Corr.*, 831 F.3d at 73. In any event it is unclear how such blockages could be attributable to the Village, since Plaintiff could not testify to the ownership of those vehicles. *See* Dkt. No. 174-1 at ¶ 196. Blocking the driveway, much like the closing of the sidewalk, is also something that would have impacted all users of the Grace Way driveway and cannot be shown to be because of Plaintiff's disability.

Defendant, therefore, is entitled to summary judgment on this aspect of Plaintiff's ADA claim.

25

*ii. Alternate Pedestrian Walkway*

At some point shortly into this project, a temporary pedestrian access route was established to funnel traffic away from the sidewalk. *See* Laws Decl. at Ex. N; Wojdan-Price Decl. at Ex. E2. Plaintiff has presented evidence that this access route was not ADA compliant. Dkt. No. 179 at pp. 3-8. Her expert witness, Ms. Lobo, highlighted several purported deficiencies with this path, including the lack of a ramp from the curb to the street, the placement of metal barricades potentially creating a tripping hazard, and the insufficient width of the path. *Id.* at p. 5. The issues identified, unlike the total sidewalk closure, could specifically impact Plaintiff's unique ability to use the walkway.

When circumstances posing a potential denial of access exist, courts often apply a burden shifting framework to assess the ADA claim. *Woods v. Tompkins Cnty.*, 2016 WL 5107120, at *3 (N.D.N.Y. Sept. 20, 2016); *Ali v. Hogan*, 2014 WL 6810712, at *5 (N.D.N.Y. Dec. 2, 2014). This analysis presents an inherently fact-specific inquiry because "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013) (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)); *see also Wright v. New York State Dep't of Corr.*, 831 F.3d at 72-73; *Kramer v. Dep't of Correction*, 2019 WL 4805152, at *12 (D. Conn. Sept. 30, 2019), *aff'd*, 828 F. App'x 78 (2d Cir. 2020).

In this framework Plaintiff bears the initial burden to show that reasonable accommodations were available. *Celeste v. E. Meadow Union Free Sch. Dist.*, 373 F. App'x 85, 88 (2d Cir. 2010). That burden is "not a heavy one." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137 (2d Cir. 1995). The burden then shifts to the Defendant to show that the proposed accommodations constitute an undue burden, based on a variety of factors including cost, practicality, and feasibility. *Id.* at 138-39.

The parties do not fully engage on the practicalities of alternatives that may have been available in such a situation.[9] Plaintiff's expert identified various ADA deficiencies in the temporary pedestrian walkway, some of which it would seem could have been easily remediated, but she offered no guidance about how that would be done. Defendant's expert, like Plaintiff's, did not observe the temporary route while it was in place and did not even opine on whether it was ADA compliant. *See* Dkt. No. 162-17 at p. 2; Dkt. No. 173-4 at ¶ 34; Dkt. No. 179 at p. 3. Here, Plaintiff has presented evidence of a potential ADA violation, but given the paucity of the record on whether and how these issues could be remedied, questions of fact exist that preclude summary judgment for either party.

---

[9] Defendant focuses its argument on the fact that summary judgment is appropriate because Plaintiff fails to show that removal of the barriers was "readily achievable" as required by 42 U.S.C. § 12182(b)(2)(A)(iv). Def.'s Mem. of Law at pp. 20-22. However, "42 U.S.C. § 12182(b)(2)(A)(iv) applies to Title III of the ADA concerning public accommodations, not Title II concerning public entities. Accordingly, this 'readily achievable' standard that [Defendant] asks the court to apply to Plaintiff['s] Title II claims is wholly inapplicable." *McMillon v. Hawaii*, 2009 WL 10757954, at *12 (D. Haw. June 19, 2009); *see also Civic Ass'n of Deaf of New York City, Inc. v. Giuliani*, 915 F. Supp. 622, 636 (S.D.N.Y. 1996) (noting differences between Title II and Title III).

27

<u>b. Main Street Project</u>

While Plaintiff also asserts a claim regarding denied access as a result of the Main Street project, the record establishes very little, with one exception, about how Plaintiff claims she was denied such access.

The Amended Complaint alleges, *inter alia*, the failure to install a waterline to service the Grace Way Property that was in original plans, the creation of non-ADA compliant barriers, and leaving construction materials on Plaintiff's property. Am. Compl. at ¶¶ 87 & 89. In response to an Interrogatory asking Plaintiff to identify "each barrier or deficiency that you personally observed or experienced that was created by Defendant" with respect to the Main Street project, Plaintiff identified the lack of waterline, the "remov[al of] large sections of the Main Street public walkway while businesses remained open to the public without ADA compliant walkway diversions," a "non-conforming curb that is inches tall directly in Fletchers [sic] path and on her Lot . . . [m]aking Fletcher's gate on her only path un-operational for her use," and the leaving of "construction debris on the Fletcher Lot where it was not accessible for her to cleanup and dispose of." Bliss Decl., Ex. A at pp. 7 & 9-11.

The extent to which she was denied access to Main Street or the adjacent sidewalk by construction and non-ADA compliant walkways is entirely unclear. In sharp contrast to the evidence presented by Plaintiff regarding work during the Northwood School's construction, the record is devoid of any photographs, videos, or testimony from Plaintiff about what obstacles she faced during the Main Street project. This may well be

explained by the fact that Plaintiff was absent from the Village for an extended period of time during the Main Street reconstruction.  She rented the Grace Way Property to a third party for between twelve and eighteen months during portions of the Main Street project. Pl.'s Dep. Vol. 2 at pp. 15-17; Dkt. No. 174-1 at ¶¶ 73-76.  Plaintiff concedes that she was in Virginia for much of the project and extended her time there based on reports from Hughes that "it was not accessible for [her] to come up to Lake Placid," Pl.'s Dep. Vol. 2 at p. 20, but she does not recall for how long she was present in Lake Placid during this project.  *Id.* at p. 19; Dkt. No. 174-1 at ¶¶ 213-17.  The Amended Complaint alleges that Plaintiff left Lake Placid "for a period of time" around the commencement of the project in Spring 2022.  Am. Compl. at ¶ 90.  She returned on November 28, 2022.  *Id.* at ¶ 91. There is a complete lack of evidence that Plaintiff actually encountered disruptions on Main Street during this project, which precludes her general claim regarding her alleged lack of access during this project.

Plaintiff also fails to carry her initial burden regarding claims related to the failure to install a waterline and the leaving of construction debris on her property.  As was discussed in detail above, an ADA claim requires Plaintiff to show that the challenged conduct arose because of her disability.  *See* 42 U.S.C. § 12132.  Significantly, Plaintiff makes barely any mention of these issues in her motion papers.  Moreover, nothing in the record shows that either the identified waterline or debris issues came to be because of Plaintiff Fletcher's disability or uniquely affected her because of her disability.  Those

issues would have affected Fletcher and Hughes the same.  As a result, Fletcher has no claim with respect to those issues.

There is a significant noted exception.  Ms. Fletcher does assert that at the conclusion of the project the completed sidewalk was in violation of the ADA.  Specifically, she alleges that the reconstructed sidewalk was not even with the Hughes stairs and thus hindered her access.  Am. Compl. at ¶¶ 91-92.  Plaintiff's expert opined that the sidewalk installed during the Main Street project rendered the Hughes stairs "unusable" because of the gap between the steps and the sidewalk which, according to the expert, created an elevation difference of more than one inch beyond the allowable, forcing Fletcher to install a ramp from her steps to the sidewalk.  Dkt. No. 179 at pp. 13-14.  Defendant's expert opined that the Hughes stairs themselves were not ADA compliant and that it is the property owners' obligation to render their property accessible.  Dkt. No. 162-17 at pp. 4, 6, & 7.  That expert also noted that several other property entrances along Main Street were not flush with the sidewalk and that this was not inconsistent with the ADA.  *Id.* at pp. 5 & 6.

Questions of fact, therefore, exist on the question of whether meaningful access was denied by virtue of the difference in height between the sidewalk and the Hughes stairs.  And as with the issue concerning the alternative pedestrian access, here too the parties do little to address the reasonableness of this action.  Based on the information provided by the parties, the Court cannot assess the degree of access denial and whether

reasonable accommodations are available to address it.  Summary judgment as to this aspect of Plaintiff's claim must be denied as a result.

### 3. Defendant's Remaining Arguments

Apart from defenses of the merits, the Village seeks summary judgment on several additional grounds which are considered below.

### a. Damages

The Village suggests that "compensatory damages" are not available under Title II.  Def.'s Mem. of Law at p. 17 n.5 (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022)).  *Cummings*, however, held only that damages for emotional distress were unavailable for purposes of the Rehabilitation Act, not that all forms of compensatory damages were unavailable.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. at 230.  The Second Circuit has since found that this holding also applies to claims under Title II of the ADA.  *Doherty v. Bice*, 101 F.4th 169, 175 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 381 (2024).  The Court notes that punitive damages also are not available under Title II.  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  Just last year in *J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, however, the Supreme Court held that Title II "authorize[s] individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." 605 U.S. 335, 339 (2025).  The Court, therefore, presumes that Plaintiff Fletcher's ADA claim can proceed as to non-emotional distress, non-punitive damages claims.

### b. Mootness

The Village argues that the completion of the Northwood and Main Street projects moots Plaintiff Fletcher's ADA claim.  Def.'s Mem. of Law at pp. 15-16.  The Court disagrees.

"A case becomes moot pursuant to Article III's Case or Controversy Clause when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *United States v. Young*, 998 F.3d 43, 51 (2d Cir. 2021) (quoting *Tanasi v. New All. Bank*, 786 F.3d 195, 198 (2d Cir. 2015)).  The mere fact that the projects, which were the cause of the allegedly unlawful access disruptions, have been completed is not a basis for mooting Plaintiff's claim.  Here, Plaintiff seeks monetary damages and so relief remains available from the Court.  "The availability of monetary damages prevents dismissal for mootness."  *Lillbask ex rel. Mauclaire v. Sergi*, 193 F. Supp. 2d 503, 509 (D. Conn. 2002) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 608-09 (2001)).  The matter thus is clearly not moot.  Any other ruling would permit violations of the ADA without recourse provided that the project could be completed more quickly than litigation to address it.

### c. Standing

Defendant also contends that Plaintiff lacks standing to assert her Title II claim. Def.'s Mem. of Law at pp. 17-20.

32

"Under Article III of the Constitution, plaintiffs must have a 'personal stake' in a case to have standing to sue." *Bost v. Illinois State Bd. of Elections*, 146 S. Ct. 513, 519 (2026) (quoting *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024)).

> In the ADA context, we have said that a plaintiff adequately alleges injury when "(1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendant's services to plaintiff's home, that plaintiff intended to return to the subject location."

*Lugo v. City of Troy, New York*, 114 F.4th 80, 86 (2d Cir. 2024) (quoting *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187-88 (2d Cir. 2013)) (internal alterations omitted).

Here again, while Defendant places emphasis on the completion of the construction projects, the Court does not find this a barrier to Plaintiff's standing. Plaintiff has clearly alleged a past injury. While the construction projects are complete, Plaintiff alleges that the area where the Hughes stairs meet the Main Street sidewalk remains out of compliance with ADA standards. Plaintiff resides in the Village and so the alleged noncompliance amounts to a continuing issue that she has standing to address.

The Court, therefore, finds that standing is not a basis for granting summary judgment to the Village.

### 4. ADA Coordinator

Plaintiff makes several references in the motion papers to the fact that the Village did not have a designated ADA coordinator until 2023. Pls.' Mem. of Law at pp. 9-10; Pl.'s Opp. at pp. 5 & 18. It is unclear whether this was a claim properly set forth in the

33

Amended Complaint.  *See* Am. Compl. at ¶ 98 (only mention of ADA coordinator in pleading).  To the extent it is, summary judgment on this claim is granted to Defendant.

A municipality employing fifty or more people is required to "designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities" under the ADA.  28 C.F.R. § 35.107.  The Village does not dispute that it had more than fifty employees, and concedes that the official designation of an ADA Coordinator did not take place until March 6, 2023.  Dkt. No. 173-4.

This is not a basis for a claim, however, because there is no cause of action for noncompliance with section 35.107.  The regulation provides:

(a) Designation of responsible employee. A public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part. The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.

(b) Complaint procedure. A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part.

28 C.F.R. § 35.107.

Courts throughout the country have held "there is no private right of action to enforce section 35.107." *Shaw v. Floyd*, 2017 WL 2348818, at *3 (N.D. Tex. Mar. 27, 2017), *report and recommendation adopted*, 2017 WL 2335621 (N.D. Tex. May 30, 2017); *see also Jones v. City of Detroit*, 2023 WL 1819141, at *2 (E.D. Mich. Feb. 8,

2023); *Reyes v. Larimer Cnty.*, 2019 WL 9093606, at *3 (D. Colo. July 17, 2019), *report and recommendation adopted*, 2019 WL 9093605 (D. Colo. Aug. 6, 2019), *aff'd*, 796 F. App'x 497 (10th Cir. 2019); *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 555 (D. Md. 2019) (citing cases); *Wray v. Oregon Dep't of Corr.*, 2013 WL 3479477, at *15 (D. Or. July 8, 2013); *DeLeon v. City of Alvin Police Dep't*, 2011 WL 43432, at *5 (S.D. Tex. Jan. 6, 2011). Courts have been repeatedly cautioned against implying private rights of action. *See Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022). Consistent with this direction, the Court has considered those cases carefully and adopts the rationale contained in them. Any claim asserted with respect to the alleged violation of the ADA grievance procedures, therefore, is dismissed.

### 5. Title III

The Amended Complaint also asserted a claim under Title III of the ADA. Am. Compl. at ¶¶ 247-49. Fletcher seeks summary judgment as to this claim. Pls.' Mem. of Law at pp. 7-12. This aspect of Plaintiff's Motion must be denied as moot since Plaintiff's Title III claim has already been dismissed. In Judge Sannes' decision addressing various motions to dismiss she identified what claims remained. The Court identified only "1) Plaintiffs' Section 1983 claim against the Village of Lake Placid for municipal liability; and 2) Plaintiff Fletcher's Title II ADA disability discrimination claim against the Village of Lake Placid." Dkt. No. 109 at p. 50. As a result, this case has been litigated for over two years on the presumption that no Title III claim remained pending, a holding that is

35

entirely consistent with the well-established rule that Title III "applies only to private entities." *Moore v. United States*, 2022 WL 1104986, at *1 (W.D.N.Y. Apr. 13, 2022) (citing cases); *see also Benyi v. New York*, 2021 WL 1406649, at *14 (N.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) ("Title III expressly does not apply to public entities, including local governments.").

## V.  CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that Defendant's Motion for Summary Judgment (Dkt. No. 160) is **GRANTED IN PART AND DENIED IN PART** as follows:

1) Defendant's Motion is granted as to Plaintiffs' section 1983 claim.  Since Plaintiff Hughes is only a party to this claim, the Clerk is directed to terminate him as a party;

2) Defendant's Motion is granted in part as to Plaintiff Fletcher's Title II claim as set forth above and is otherwise denied; and it is further

**ORDERED**, that Plaintiffs' Motion for Summary Judgment (Dkt. No. 162) is **DENIED**; and it is further

**ORDERED**, the matter is scheduled for trial beginning October 5, 2026, at 9:30 a.m. at the James T. Foley Courthouse in Albany.  Trial will be limited to Plaintiff Fletcher's claim under Title II of the Americans with Disabilities Act; and it is further

**ORDERED**, that counsel for the parties are directed to appear in person for a pretrial conference on August 7, 2026, at 11:00 a.m. in Room 409 of the James T. Foley Courthouse.  Counsel that will be trying the case are directed to appear; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order upon the parties to this action.

Dated:  July 27, 2026
       Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

37